**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GLOBALTAP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:18-cv-05383 |
| PETERSEN MANUFACTURING CO. INC., | ) | |
| CHRIS PETERSEN, MIKE SIEMER, | ) | JURY TRIAL DEMANDED |
| W.W. GRAINGER, INC., ZORO TOOLS, INC, | ) | |
| PARK N' POOL, INC., NEOBITS, INC., AND | ) | |
| CAREFORDE SAFETY, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**PARKNPOOL'S ANSWER AND AFFIRMATIVE DEFENSES TO COUNTS II, IV AND**
**VI OF PLAINTIFF'S COMPLAINT**

Defendant ParknPool Corp. (improperly named as Park N' Pool, Inc.) ("PNP"), for its

answer and affirmative defenses to Counts II, IV and VI of Plaintiff's Complaint, states as

follows:

**The Parties**

1.    GlobalTap was founded by Daniel H. Whitman ("Whitman") "to provide people
with a more innovative, and compelling way to connect with each other through easier access to
clean, free drinking water." GlobalTap is a Michigan limited liability company with its principal
place of business located at 18075 Mt. Zion Rd., Galien, Michigan. GlobalTap does substantial
business in Illinois, including in Cook County, Illinois.

**ANSWER:    PNP lacks knowledge or information sufficient to form a belief about**

**the truth of the allegations in this paragraph.**

2.    Whitman is a Michigan citizen. Whitman is the only member of GlobalTap.

**ANSWER:    PNP lacks knowledge or information sufficient to form a belief about**

**the truth of the allegations in this paragraph.**

3.      Petersen is an Iowa corporation with its principal place of business at 2471 Hwy. 30, Denison, Iowa. According to Petersen's website, "Petersen Manufacturing Site Furnishings is a nationally recognized leader in the production of high-quality precast concrete site amenities" and its "concrete products are manufactured in Denison, Iowa, and have representation in every state, Canada, Puerto Rico, Hong Kong, and Mexico by authorized Petersen representatives." https://www.petersenmfg.com/about.asp (accessed on July 24, 2018).

**ANSWER:      PNP admits the allegations in this paragraph, on information and belief.**

4.      C. Petersen is, upon information and belief, an Iowa citizen.

**ANSWER:      PNP admits the allegations in this paragraph, on information and belief.**

5.      Siemer is, upon information and belief, an Iowa citizen.

**ANSWER:      PNP admits the allegations in this paragraph, on information and belief.**

6.      Grainger is an Illinois corporation with its principal place of business in Lake Forest, Illinois.

**ANSWER:      PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

7.      Zoro is a Delaware corporation with its principal place of business in Buffalo Grove, Illinois.

**ANSWER:      PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

8.      Upon information and belief, Park n' Pool is a Virginia corporation with its principal place of business in Lexington, Virginia.

**ANSWER:      PNP states that its correct name is ParknPool Corp. and not Park n' Pool, Inc., but PNP otherwise admits the allegations in this paragraph.**

302997970v1 1012263

9.     Upon information and belief, Neobits is a California corporation with its principal place of business in Santa Clara, California.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

10.     Careforde is a Delaware corporation with its principal place of business in Chicago, Illinois.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

**Jurisdiction and Venue**

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), which grants the district courts "original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . and trademarks," and 28 U.S.C. § 1367, which provides for "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

**ANSWER:     PNP admits that this Court has subject matter jurisdiction over the patent and trademark claims asserted in Plaintiff's complaint, but otherwise denies the allegations in this paragraph and denies that the Court has subject matter jurisdiction over the state law claims.**

12.     This Court has personal jurisdiction over Petersen pursuant to Federal Rule of Civil Procedure 4 and 735 ILCS 5/2-209(a) and (b) because, among other things, Petersen has transacted business in Illinois, including but not limited to conducting business with Illinois companies and companies operating in Illinois, including GlobalTap, made or performed a contract within Illinois, and committed tortious acts in Illinois. Petersen, through its agents, attended meetings in Chicago with GlobalTap to discuss the manufacture of GlobalTap products. Petersen has sold and continues to sell products infringing on GlobalTap's intellectual property within Illinois.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

302997970v1 1012263

13.      This Court has personal jurisdiction over C. Petersen pursuant to Federal Rule of Civil Procedure 4 and 735 ILCS 5/2-209(a) and (b) because, among other things, C. Petersen is president of Petersen and has transacted business on Petersen's behalf with Illinois companies and companies operating in Illinois, including GlobalTap.

**ANSWER:**      **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

14.      This Court has personal jurisdiction over Siemer pursuant to Federal Rule of Civil Procedure 4 and 735 ILCS 5/2-209(a) and (b) because, among other things, Siemer is a vice president of Petersen and has conducted business on Petersen's behalf with Illinois companies and companies operating in Illinois, including GlobalTap. Siemer traveled to Chicago to meet with Whitman to discuss Petersen manufacturing GlobalTap's products.

**ANSWER:**      **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

15.      This Court has personal jurisdiction over Grainger pursuant to Federal Rule of Civil Procedure 4 and 735 ILCS 5/2-209(b), because it is an Illinois corporation with its principal place of business in Illinois.

**ANSWER:**      **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

16.      This Court has personal jurisdiction over Zoro pursuant to Federal Rule of Civil Procedure 4 and 735 ILCS 5/2-209(b), because its principal place of business is located in Illinois.

**ANSWER:**      **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

17.      This Court has personal jurisdiction over Park n' Pool pursuant to Federal Rule of Civil Procedure 4 and 735 ILCS 5/2-209(a), because it has transacted business in Illinois by virtue of its advertising and sales of products, including products marketed as GlobalTap products, to individuals and entities located in Illinois.

**ANSWER:**      **PNP denies the allegations in this paragraph.**

18.      This Court has personal jurisdiction over Neobits pursuant to Federal Rule of Civil Procedure 4 and 735 ILCS 5/2-209(a), because it has transacted business in Illinois by virtue of its advertising and sales of products, including products marketed as GlobalTap products, to individuals and entities located in Illinois.

4

**ANSWER:** **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

19.     This Court has personal jurisdiction over Careforde pursuant to Federal Rule of Civil Procedure 4 and 735 ILCS 5/2-209(b), because its principal place of business is located in Illinois.

**ANSWER:** **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

20.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400, because at least three Defendants are located in this district and a substantial portion of the facts giving rise to this claim occurred in this district. The initial negotiations between GlobalTap and Petersen occurred in Chicago, Illinois and involved Petersen representatives, including Siemer, traveling to Chicago to meet with Whitman. Further, Grainger, Zoro, and Careforde are located in Cook County, Illinois and purchased infringing products from Petersen and subsequently marketed and sold those infringing products to others.

**ANSWER:** **PNP denies that venue is proper in this District and therefore denies the allegations in this paragraph.**

### Factual Background

21.     GlobalTap was founded in 2008 with the goal of providing people with easy access to clean, free water in cities, schools, and communities around the world.

**ANSWER:** **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

22.     In 2009, Whitman, along with Anastasios Karahalios ("Karahalios") and Andrew Burroughs ("Burroughs"), developed a design for a free-standing outdoor water bottle filling station. At the time, there were no similar designs on the market.

**ANSWER:** **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

23.     On December 14, 2009, Whitman, Karahalios, and Burroughs filed for a design patent under U.S. Application No. 29/351,948. The patent issued on March 15, 2011 as Patent No. D634, 394 S ("'394 Patent"). The '394 Patent identified one claim, which was for "[t]he ornamental design for a water bottle fountain, as shown and described." See '394 Patent, attached hereto as Exhibit A.

302997970v1 1012263

**ANSWER:** **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

24.     The design depicted a free-standing water bottle filling station, consisting of a vertical base ending in a hook or cane shape, under which a water bottle may be placed vertically to be filled:



**ANSWER:** **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

25.     The '394 Patent was assigned by all three inventors to GlobalTap on February 4, 2013. GlobalTap is the exclusive owner of all rights, title, and interest in the '394 Patent, and has the right to bring this suit to recover damages for any current or past infringement.

**ANSWER:** **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of this paragraph. PNP denies the allegations in the second sentence of this paragraph.**

26.     On February 1, 2011, Whitman, Karahalios, and Burroughs filed for a separate design patent under U.S. Application No. 29/384,581. The patent issued on October 4, 2011, as Patent No. D646, 348 S ("'348 Patent"). The '348 Patent identified one claim, which was for

302997970v1 1012263

"[t]he ornamental design for a water bottle fountain with side bubbler, showing our new, original and ornamental design."  See '348 Patent, attached hereto as Exhibit B.

**ANSWER:   PNP denies that Whitman, Karahalios and Burroughs were the inventors or creators of the design that is the subject of the patent referred to in this paragraph and therefore denies the validity of the '348 Patent.  PNP lacks knowledge or information sufficient to form a belief about the truth of all other allegations in this paragraph.**

27.    The design depicted a free-standing water bottle filling station, consisting of a vertical base ending in a hook or cane shape, under which a water bottle may be placed vertically to be filled. Attached to the vertical base was a traditional-style water fountain protruding outward, from which individuals may drink without a water bottle:



**ANSWER:    The design depicted in the '348 Patent speaks for itself.  PNP denies that Whitman, Karahalios and Burroughs were the inventors or creators of the design in the '348 Patent and therefore denies the validity of the '348 Patent claimed to be owned by GlobalTap.  PNP denies all other allegations in this paragraph.**

302997970v1 1012263

28.     The '348 Patent was assigned by all inventors to GlobalTap on February 4, 2013. GlobalTap is the exclusive owner of all rights, title, and interest in the '348 Patent, and has the right to bring this suit to recover damages for any current or past infringement.

**ANSWER:**     **PNP denies the allegations in this paragraph.**

29.     With the development of its patented designs, GlobalTap also developed and began using various service marks. These include the word mark "GLOBALTAP" ("Word Mark") as well as a mark consisting of "GLOBALTAP" followed by a water droplet ("Water Drop Mark"), as depicted below:

# GLOBALTAP ⬤

**ANSWER:**     **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

30.     GlobalTap first used the Word Mark and the Water Drop Mark in May, 2008. The Water Drop Mark was first used in commerce on December 31, 2009, while the Word Mark was first used in commerce on September 30, 2011.

**ANSWER:**     **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

31.     GlobalTap has since obtained registrations for each. The Water Drop Mark was registered on July 21, 2015, under Registration No. 4,775,089. The Word Mark was registered on March 22, 2016, under Registration No. 4,920,350.

**ANSWER:**     **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

32.     In late 2010, GlobalTap approached Petersen to discuss Petersen manufacturing GlobalTap's designs. GlobalTap identified Petersen as a potential manufacturer because of its reputation and history producing other outdoor fixtures, including benches, steel garbage cans, and concrete fountains.

**ANSWER:**     **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

302997970v1 1012263

33.     Before beginning negotiations, Petersen signed a "Confidential Disclosure Agreement," in which Petersen agreed it "will not utilize the INFORMATION beyond the PURPOSE without first obtaining the written consent of the DISCLOSING PARTY." The "Purpose" was defined as exploring "their mutual interests in [GlobalTap's] project concerning distribution and access to water." The "Information" covered by the agreement expressly included GlobalTap's prototypes and designs.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

34.     Whitman met with Rick Carstensen and Siemer in Chicago at GlobalTap's designer's office. At the meeting, Whitman provided Petersen with GlobalTap's designs, as well as a prototype. Petersen then took the information to their Iowa plant to provide recommendations on production.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

35.     Following Petersen's review of the designs and prototype, GlobalTap and Petersen entered into an oral contract for Petersen to manufacture GlobalTap's products. Pursuant to the terms of the agreement, Petersen would be GlobalTap's exclusive manufacturer. GlobalTap would pay Petersen up front per unit manufactured. Petersen would provide a two-year warranty on all products manufactured.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

36.     GlobalTap, in turn, would sell the units for double what Petersen charged for its manufacture.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

37.     Upon reaching the oral agreement, Whitman began talking with Siemer about putting the arrangement between GlobalTap and Petersen in writing. Petersen offered to prepare an agreement, but no draft ever came. The companies continued to operate under the oral agreement.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

302997970v1 1012263

38.     Sometime later, Petersen raised the idea to GlobalTap of trying to sell some of GlobalTap's fountains to Petersen's existing customers. GlobalTap agreed to permit Petersen to do so on the following terms:

      a.     Petersen could not advertise the fountains;

      b.     50 percent of all profits from sales by Petersen would go to GlobalTap;

      c.     Petersen would provide to GlobalTap an accounting of all units sold;

      d.     GlobalTap would be included in any contract with distributors and provided an opportunity to review the terms.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

39.     In addition to the above, GlobalTap informed Petersen that any manuals for the products must include GlobalTap's name and not Petersen's, and include GlobalTap's contact information.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

40.     The rationale is simple. GlobalTap was very concerned about its image in the marketplace and wanted to maintain control over to whom and how its products were sold, as well as to ensure any product issues were properly resolved.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

41.     As Petersen began to ramp up production of GlobalTap's product, complaints began to come in from customers. Customers complained of rusting on different parts of the fountains, scratches, missing parts, sticking buttons, and other issues.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

42.     GlobalTap attempted to address the issue with Petersen in hope of maintaining the relationship, given the significant effort associated with identifying and reaching an agreement with a new manufacturer. Around this time, GlobalTap also again requested to put the parties' agreement in writing.

**ANSWER:** PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

43.    The problems with Petersen's manufacturing persisted. To compound matters, Petersen failed to follow through on its agreement to a two-year warranty. While it stated it would address the customer complaints, it never did.

**ANSWER:** PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

44.    Petersen's poor-quality products and failure to address customer concerns damaged GlobalTap's reputation and caused it to lose various business opportunities.

**ANSWER:** PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

45.    Sometime later, GlobalTap heard through industry sources that Petersen was signing contracts and selling GlobalTap products to distributors without GlobalTap's consent or authorization, and without paying GlobalTap its agreed upon share of revenues.

**ANSWER:** PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

46.    Upon hearing this, GlobalTap immediately reached out to Petersen, through Siemer, and instructed Petersen to stop contracting to distribute GlobalTap products without GlobalTap's permission. Petersen, however, ignored the instruction. Soon, GlobalTap began to see its products advertised by several distributors with whom GlobalTap had never contracted.

**ANSWER:** PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

47.    GlobalTap continued to attempt to memorialize its agreement with Petersen, recognizing the significant cost associated with starting over with a new manufacturer. Petersen, recognizing the situation, continued to string GlobalTap along by continuing discussions of a written agreement. Petersen's actions, though, were merely to delay while it continued to manufacture and sell GlobalTap products without permission.

**ANSWER:** PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

302997970v1 1012263

48.     GlobalTap also requested an accounting of all GlobalTap fountains sold and to whom they were sold. GlobalTap requested copies of any agreements to distribute GlobalTap fountains. It also demanded its portion of the revenue from all such sales. Petersen refused. At the same time, Petersen continued to neglect its warranty issues.

**ANSWER:**     **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

49.     Petersen continues to market GlobalTap products, including selling fountains to major distributors such as Grainger. When confronted, Petersen stated that it would continue to sell GlobalTap's products and, if necessary, would simply remove the GlobalTap name.

**ANSWER:**     **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

50.     At the same time, Petersen stopped fulfilling orders placed by GlobalTap.

**ANSWER:**     **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

51.     The products sold by Petersen include the designs patented under the '394 Patent and the '348 Patent, among other GlobalTap designs. The products also include the Word Mark and the Water Drop Mark.

**ANSWER:**     **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

52.     For example, as of July 24, 2018, Grainger's website listed for sale the fountain with the design described in the '348 Patent, for a price of either $4,972 or $5,494 per unit:

302997970v1 1012263





A screenshot of Grainger's website as of July 24, 2018, is attached hereto as Exhibit C.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

53.     The design is identical to or substantially indistinguishable from the design that is the subject of the '348 Patent and includes GlobalTap's Word Mark, Water Drop Mark, or both. The product comes up on Grainger's website by searching "globaltap."

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

54.     As of July 24, 2018, Grainger's website also listed for sale the fountain with the design described in the '394 Patent, for a price of $4,011 per unit:

13





A screenshot of the Grainger website as of July 24, 2018, is attached hereto as Exhibit D.

**ANSWER:** **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

55. The design is identical to or substantially indistinguishable from the design that is the subject of the '394 Patent and includes GlobalTap's Word Mark, Water Drop Mark, or both.

**ANSWER:** **PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

14

56.     Grainger sells additional designs developed by GlobalTap and that include GlobalTap's Word Mark, Water Drop Mark, or both.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

57.     Upon information and belief, Grainger obtains the infringing products from Petersen. GlobalTap has not authorized, licensed, or otherwise consented to Grainger marketing or selling GlobalTap products or products including GlobalTap's marks, nor has it authorized Petersen to manufacture for or sell to Grainger GlobalTap products or products including GlobalTap's marks.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

58.     GlobalTap's patented designs are also being sold by Park n' Pool, including the designs that are the subject of the '394 Patent and '348 Patent.   Screenshots from Park n' Pool's website as of July 24, 2018, marketing the patented designs are attached hereto as Group Exhibit E.

**ANSWER:     PNP admits that it has, in the past, sold a small number of fountains with the GlobalTap name on them but PNP denies that it is currently selling or marketing such fountains.  PNP denies that GlobalTap has valid patents to the designs alleged.  PNP admits that Group Exhibit E to the Complaint contains screen shots of certain information on PNP's website as of 7/24/18 but states that such information is no longer on its website. PNP denies all other allegations in this paragraph.**

59.     The designs are identical to the designs that are the subject of the '394 and '348 Patents and include GlobalTap's Word Mark, Water Drop Mark, or both. The products are identified as GLOBAL TAP products on the website.

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

60.     Park n' Pool sells additional designs developed by GlobalTap and that include GlobalTap's Word Mark, Water Drop Mark, or both.

**ANSWER:     PNP denies the allegations in this paragraph.**

61.     Upon information and belief, Park n' Pool obtains the infringing products from Petersen. GlobalTap has not authorized, licensed, or otherwise consented to Park n' Pool marketing or selling GlobalTap products or products including GlobalTap's marks, nor has it authorized Petersen to manufacture for or to sell to Park n' Pool GlobalTap products or products including GlobalTap's marks.

**ANSWER:     PNP admits that it obtained a small number of the fountains at issue from Petersen Manufacturing Co., Inc ("PMC").  PNP denies all other allegations in this paragraph.**

62.     Other entities selling unauthorized and counterfeit versions of GlobalTap's patented designs include, but are not limited to, the following:

    a.     Zoro (see Screenshots from July 24, 2018, attached hereto as Group Exhibit F);

    b.     Neobits (see Screenshot from July 24, 2018, attached hereto as Exhibit G);

    c.     Careforde (see Screenshot from July 24, 2018, attached hereto as Exhibit H).

**ANSWER:     PNP lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

63.     The designs for sale by each of the above-referenced companies include designs identical to the designs that are the subject of the '394 Patent and '348 Patent and include GlobalTap's Word Mark, Water Drop Mark, or both. In addition to the designs subject to the '394 Patent and the '348 Patent, each of the distributors identified herein sells various other designs developed by GlobalTap and purporting to be GlobalTap products. GlobalTap has not authorized the manufacture, sale, distribution, or promotion of any such products by any of the companies identified herein.

**ANSWER:     PNP denies that it is selling any products designed or developed by GlobalTap or that include GlobalTap's alleged word mark or water drop mark.  PNP also denies the allegations in the last sentence of paragraph 63.  PNP lacks knowledge or information sufficient to form a belief about the truth of all other allegations in this paragraph.**

16

64.    Upon information and belief, each of the above-referenced companies obtains the infringing products from Petersen. GlobalTap has not authorized, licensed, or otherwise consented to the above-referenced companies marketing or selling GlobalTap products or products including the GlobalTap marks, nor has it authorized Petersen to manufacture for or to sell to the above-referenced companies GlobalTap products or products including GlobalTap's marks.

**ANSWER:    PNP admits that PMC provided certain fountains to PNP with GlobalTap's permission and approval.  PNP denies all other allegations in this paragraph.**

65.    When confronted, Siemer told Whitman that Petersen is going to continue manufacturing the patented designs and other GlobalTap products, regardless of GlobalTap's objections.

**ANSWER:    PNP lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

66.    Petersen continues to manufacture and sell unauthorized versions of GlobalTap's patented designs and to make unauthorized use of GlobalTap's registered marks, despite GlobalTap making repeated requests for Petersen to cease and desist such production and sale. Most recently, on December 5, 2017, GlobalTap sent a cease and desist letter to Petersen, directed to C. Petersen. A copy of the December 5, 2017, letter is attached hereto as Exhibit I. The letter demanded that Petersen cease its unauthorized use of GlobalTap's registered marks. Petersen refused to comply.

**ANSWER:    PNP lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

67.    Petersen is knowingly violating GlobalTap's patents and registered marks. C. Petersen and Siemer have actively participated in Petersen's willful infringement of GlobalTap's intellectual property, as evidenced by Petersen's continued infringement despite C. Petersen and Siemer each personally having been informed of Petersen's unauthorized use.

**ANSWER:    PNP lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

### Injunctive Relief

68.    In various counts set forth below, GlobalTap requests preliminary and permanent injunctive relief.

302997970v1 1012263

**ANSWER:** **PNP admits that GlobalTap is asking for preliminary and permanent injunctive relief but denies that GlobalTap is entitled to such relief.**

69. GlobalTap invested substantial resources in the development of its intellectual property, including the '394 Patent, the '348 Patent, the Word Mark, and the Water Drop Mark, as well as its other proprietary designs and brand goodwill. As such, GlobalTap has a legitimate business interest and clearly ascertainable right in need of protection.

**ANSWER:** **PNP denies the allegations in this paragraph.**

70. Defendants have infringed and continue to infringe on GlobalTap's intellectual property, and to use GlobalTap's name and designs to sell products unauthorized by GlobalTap. Absent the injunctive relief requested herein, GlobalTap will suffer irreparable harm. This includes lost goodwill and reputational harm, as well as lost business opportunities, which cannot adequately be compensated through money damages.

**ANSWER:** **PNP denies the allegations in this paragraph.**

71. Given the egregious and willful nature of the infringement by Petersen, and its deliberate sale of counterfeit products to distributors, including Grainger, Zoro, Park n' Play, Neobits, and Careforde, each of whom sell such counterfeit products to the public, GlobalTap is likely to be successful on the merits of each claim in which injunctive relief is sought.

**ANSWER:** **PNP denies the allegations in this paragraph.**

72. To deny GlobalTap injunctive relief is to permit Defendants to continue selling counterfeit products under GlobalTap's name. Further, GlobalTap does not even know all of the distributors to whom Petersen has sold or is selling the infringing products, making it otherwise impossible for GlobalTap to protect itself in the marketplace from harm caused by the infringing products.

**ANSWER:** **PNP denies the allegations in this paragraph.**

73. Such injunctive relief, which would prevent the manufacture and sale of counterfeit products, is in the public interest in that it will remove unauthorized, shoddy products from the marketplace and deter future infringers from abusing the intellectual property rights of GlobalTap and others.

**ANSWER:** **PNP denies the allegations in this paragraph.**

302997970v1 1012263

## COUNT I – INFRINGEMENT OF THE '394 PATENT
## (PETERSEN, C. PETERSEN, SIEMER)

PNP makes no answer to Count I because Count I is not directed to PNP.

## COUNT II – INFRINGEMENT OF THE '394 PATENT
## (GRAINGER, PARK N' POOL, ZORO, NEOBITS, CAREFORDE)

83.     GlobalTap incorporates by reference the allegations in paragraphs 1 through 73 as though fully set forth herein.

**ANSWER:**    **PNP adopts and incorporates its answers to paragraphs 1 through 73 above as and for its answer to paragraph 83.**

84.     GlobalTap is the owner of the '394 Patent, including all rights to enforce the patent, by virtue of assignment to GlobalTap by all inventors executed on February 4, 2013.

**ANSWER:**    **PNP denies the allegations in this paragraph.**

85.      Grainger, Park n' Pool, Zoro, Neobits, and Careforde have infringed the '394 Patent, in violation of 35 U.S.C. §§ 271(a) and 289, by selling in the United States, without license or other authorization, products identical to or substantially indistinguishable from the design subject to the '394 Patent.

**ANSWER:**    **PNP denies the allegations in this paragraph.**

86.     GlobalTap has suffered and continues to suffer damages as a result of these Defendants' continued infringement of its patent rights.

**ANSWER:**    **PNP denies the allegations in this paragraph.**

87.     GlobalTap presently lacks the ability to fully understand the scope of its damages because it lacks the any quantitative information regarding the total number of units sold by these Defendants and to whom the units were sold, along with other significant information.

**ANSWER:**    **PNP denies the allegations in this paragraph.**

## COUNT III – INFRINGEMENT OF THE '348 PATENT
## (PETERSEN, C. PETERSEN, SIEMER)

PNP makes no answer to Count III because Count III is not directed to PNP.

## COUNT IV – INFRINGEMENT OF THE '348 PATENT
## (GRAINGER, PARK N' POOL, ZORO, NEOBITS, CAREFORDE)

97.     GlobalTap incorporates by reference the allegations in paragraphs 1 through 73 as though fully set forth herein.

**ANSWER:     PNP adopts and incorporates its answers to paragraphs 1 through 73**

**above as and for its answer to paragraph 97.**

98.     GlobalTap is the owner of the '348 Patent, including all rights to enforce the patent, by virtue of assignment to GlobalTap by all inventors executed on February 4, 2013.

**ANSWER:     PNP denies the allegations in this paragraph.**

99.     Grainger, Park n' Pool, Zoro, Neobits, and Careforde have infringed the '348 Patent, in violation of 35 U.S.C. §§ 271(a) and 289, by selling in the United States, without license or other authorization, products identical to or substantially indistinguishable from the design subject to the '348 Patent.

**ANSWER:     PNP denies the allegations in this paragraph.**

100.     GlobalTap suffered and continues to suffer damages as a result of these Defendants' continued infringement of its patent rights.

**ANSWER:     PNP denies the allegations in this paragraph.**

101.     GlobalTap presently lacks the ability to fully understand the scope of its damages because it lacks any quantitative information from these Defendants regarding the total number of units they have sold and the price at which the units were sold, along with other significant information.

**ANSWER:     PNP denies the allegations in this paragraph.**

## COUNT V – LANHAM ACT
## (PETERSEN, C. PETERSEN, SIEMER)

PNP makes no answer to Count V because Count V is not directed to PNP.

## COUNT VI – LANHAM ACT
## (GRAINGER, PARK N' POOL, ZORO, NEOBITS, CAREFORDE)

115.     GlobalTap incorporates by reference the allegations in paragraphs 1 through 73 as though fully set forth herein.

**ANSWER:     PNP adopts and incorporates its answers to paragraphs 1 through 73**

**above as and for its answer to paragraph 115.**

302997970v1 1012263

116.    GlobalTap owns valid, protectable marks in the Word Mark and Water Drop Mark.

**ANSWER:    PNP denies allegations in this paragraph.**

117.    GlobalTap's water fountains also have a distinctive design. Two such designs are patented, as set forth above. GlobalTap, however, developed additional designs incorporating distinctive GlobalTap features and characteristics.

**ANSWER:    PNP denies the allegations in this paragraph.**

118.    Grainger, Park n' Pool, Zoro, Neobits, and Careforde have used and continue to use the Word Mark and Water Drop Mark on products sold in the United States, without license, consent, or other authorization, and in relation to the marketing, promotion, or advertising of the infringing products, including, but not limited to, promoting the products as genuine GlobalTap products and including the Word Mark and Water Drop Mark on the products, manuals, and marketing materials.

**ANSWER:    PNP denies the allegations in this paragraph.**

119.    This unauthorized use of the Word Mark and Water Drop mark is likely to confuse consumers because it is used in conjunction with GlobalTap's patented designs, as well as other designs developed by GlobalTap.

**ANSWER:    PNP denies the allegations in this paragraph.**

120.    Grainger, Park n' Pool, Zoro, Neobits, and Careforde's use of GlobalTap's Word Mark and Water Drop Mark in conjunction with GlobalTap's designs amounts to counterfeiting, in that each of these Defendants is selling identical or substantially indistinguishable products under the GlobalTap name and including the Word Mark and Water Drop Mark without GlobalTap's license, consent, or authorization. These Defendants acted and are acting willfully in disregard of GlobalTap's rights.

**ANSWER:    PNP denies the allegations in this paragraph.**

121.    GlobalTap has suffered substantial damages as a result of the unauthorized and counterfeit use of the Word Mark and Water Drop Mark, as well as its patented and distinct designs, including lost profits, lost business opportunity, and reputational harm.

**ANSWER:    PNP denies the allegations in this paragraph.**

122.    GlobalTap's brand and reputation, in particular, have been damaged by the sale of shoddy counterfeit products, which do not meet GlobalTap's specifications.

**ANSWER:    PNP denies the allegations in this paragraph.**

302997970v1 1012263

123.    GlobalTap presently lacks the ability to fully understand the scope of its damages because it lacks quantitative information regarding the total number of units these Defendants have sold and the price at which the units were sold, along with other significant information.

**ANSWER:**    **PNP denies the allegations in this paragraph.**

## COUNT VII – BREACH OF CDA
## (PETERSEN)

PNP makes no answer to Count VII because Count VII is not directed to PNP.

## COUNT VIII – BREACH OF ORAL OR IMPLIED CONTRACT
## (PETERSEN)

PNP makes no answer to Count VIII because Count VIII is not directed to PNP.

## COUNT IX – TORTIOUS INTERFERENCE
## (PETERSEN)

PNP makes no answer to Count IX because Count IX is not directed to PNP.

## AFFIRMATIVE DEFENSES

PNP asserts the following affirmative defenses:

1.    GlobalTap's claims under the Lanham Act are barred because GlobalTap licensed, authorized, consented to, acquiesced in and ratified any and all sales by PMC and PNP of products that were offered in connection with the asserted GlobalTap trade name or trademarks.

2.    GlobalTap's claims under the patent laws are barred because GlobalTap licensed, authorized, consented to, acquiesced in and ratified any and all sales by PMC and PNP of products that included any designs covered by the claims of the '394 and/or '348 patents.

3.    The '394 and '348 Patents are invalid for failure to satisfy the conditions of patentability under 35 U.S.C. §§102 and/or 103.

4.    On information and belief, the '394 and '348 Patents are invalid because GlobalTap offered for sale a product substantially similar, if not identical, in design to that

22

claimed in the '394 and '348 patents at least as early as July 2009, more than one (1) year before the application date of the '348 patent.

5. On information and belief, the '394 and '348 patents are invalid because GlobalTap improperly, knowingly and with deceptive intent, filed the applications therefor with improper inventorship identified therein. Specifically, one or more PMC employees materially contributed to the designs claimed in the asserted patents. GlobalTap was aware of this, yet failed to identify either PMC or the PMC employees who contributed to the claimed designs.

6. In the event that GlobalTap is able to correct the inventorship of the '394 and '348 patents to add PMC or the PMC employees who are inventors, then GlobalTap lacks standing to bring an action for infringement of the '394 and '348 patents, because it lacks complete ownership of the patents. Those PMC employees have an obligation to assign their patent rights to PMC, so PMC would be a co-owner of the asserted patents. As a co-owner, GlobalTap would lack standing to sue for patent infringement PMC and those who sold accused products under its authority.

7. GlobalTap is not entitled to any damages for alleged patent infringement because of its failure to comply with 35 U.S.C. § 287 and/or its failure to otherwise give proper notice to Defendants that their actions would allegedly infringe the '394 and/or '348 patents.

8. The asserted trademarks are invalid and cannot be infringed upon because GlobalTap has abandoned any rights it may have had in the asserted trademarks by entering into a naked license for the trademarks. Specifically, GlobalTap licensed the asserted trademarks, with no right to exercise any quality control over the use of the trademarks. Such naked licensing

23

amounts to an abandonment of GlobalTap's rights in the asserted trademarks, and renders the trademarks invalid.

9.     GlobalTap's claims are barred by the applicable statutes of limitations and repose.

10.     GlobalTap's claims are barred by the equitable doctrines of laches, equitable estoppel and unclean hands.

11.     Plaintiff's claims against PNP should be dismissed for lack of personal jurisdiction because there was no proper service of summons and complaint on PNP and because PNP is not subject to personal jurisdiction in Illinois.

WHEREFORE, PNP prays that GlobalTap's claims against it be dismissed, that judgment be entered in favor of ParknPool Corp. and against GlobalTap and that ParknPool Corp. be awarded its attorney's fees and costs.

Respectfully Submitted

PARKNPOOL Corp.

By:     */s/ Peter D. Sullivan*
        One of its attorneys

Peter D. Sullivan
Terrance P. McAvoy
Mark K. Suri
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500
Chicago, IL  60606
312-704-3000
Firm No. 90384
psullivan@hinshawlaw.com
tmcavoy@hinshawlaw.com
msuri@hinshawlaw.com
***Attorneys for Defendants***

302997970v1 1012263

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2019, I electronically filed the above *ParknPool's Answer and Affirmative Defenses to Counts II, IV and VI of Plaintiff's Complaint* with the Clerk of the Court using the CM/ECF system, which will send notification of such filing(s) to all counsel of record.

By:  */s/ Peter D. Sullivan*
One of its attorneys

302997970v1 1012263